ERSEL H. BEUS AND ANNA M. BEUS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

W. J. BEUS AND LEONE BEUS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 60842, 60843.   Filed September 10, 1957.

*Myron E. Anderson, Esq.*, for the petitioners.
*John H. Pigg, Esq.*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies and additions to tax with respect to petitioners' income tax as follows:

| Docket No. | Year | Deficiency | Addition to tax Sec. 293 (a) | Addition to tax Sec. 294 (d) (1) |
|---|---|---|---|---|
| 60842 | 1952 | $5,769.46 | ------- | $519.86 |
| 60843 | 1952 | 11,920.46 | $596.02 | 1,195.60 |

Of the several adjustments made by respondent only three remain in dispute. The issues for decision are as follows:

(1) Whether in 1952 the petitioners sustained a loss of $20,000 with respect to an irrigation system.

(2) Whether the respondent erred in determining that the amounts of $6,500 and $8,500 paid in 1952 by W. J. Beus and Beus Bros. partnership, respectively, pursuant to the terms of a certain "FARM LEASE—With Option to Buy" were not paid as rentals.

(3) Whether respondent erred in determining additions to tax under section 293 (a), I. R. C. 1939, with respect to petitioners W. J. and Leone Beus.

### FINDINGS OF FACT.

The stipulated facts, together with annexed exhibits, are incorporated herein by this reference. Petitioners Ersel H. Beus and Anna M. Beus are husband and wife. At all times material to the issues involved they resided at Nyssa, Oregon. They filed a joint income tax return for the calendar year 1952 with the director of internal revenue for the district of Oregon. Petitioners W. J. Beus (William J. Beus) and Leone Beus are husband and wife. At all times material to the issues involved they resided at Nyssa, Oregon. They filed a joint income tax return for the calendar year 1952 with the director of internal revenue for the district of Oregon.

Ersel H. Beus and William J. Beus are brothers. Among their other business interests and activities during the taxable year 1952, they were equal members of a partnership known as Beus Bros., engaged in the business of farming. Their farming operations during that year in which their principal crops were potatoes and onions, were principally conducted on certain farmlands in Payette County, Idaho. The partnership return of income for the calendar year 1952, duly signed by W. J. Beus on behalf of said partnership, was filed with the director of internal revenue for the district of Oregon.

The farmlands referred to above, consisting of approximately 200 acres, were acquired by petitioners from Arvel L. Child and his wife at a purchase price of $61,500 under an agreement or arrangement whereby petitioners took possession and use of said property on or about January 20, 1952. Petitioners paid $5,000 down and the balance was paid upon delivery of title, December 21, 1953. The 200 acres consisted of 2 contiguous tracts of 80 and 120 acres, respectively. Petitioners acquired with the property a water right to approximately 185-acre-inches of water represented by 185 shares of the Farmers Co-operative Irrigation Co., Ltd. (hereinafter referred to as Farmers Co-op.). Shares of the Farmers Co-op. may be obtained from it at the price of $15 per share. However, on various occasions such shares have been bought and sold between individuals at prices ranging from $10 to $12.50 per share. Owners of such shares are entitled to receive from the canal of Farmers Co-op. 1 inch of water per share during each irrigation season. In order that shareholders may continue to receive water from Farmers Co-op. they must pay assessments periodically levied by it for purposes of cleaning and maintaining its canal.

Petitioners did not inspect the irrigation system before purchasing the property. The property is in an arid section of Idaho where an adequate water supply by some means or system of irrigation is essential to successful row-crop farming such as that engaged in by petitioners. Without adequate water, land in this area has a very nominal value. One-acre-inch of water per year or irrigation season is adequate for petitioners' farming operations. The normal irrigation season for petitioners begins about April 15 and ends about October 20 of each year. Of the 200 acres purchased by petitioners, approximately 185 acres were under cultivation in 1952.

The main canal of the Farmers Co-op. is about 2 miles from the petitioners' property. At this point on the canal there is a headgate through which water from the canal may be channeled into an irrigation ditch known as the Whitney Bottom Lateral (hereinafter referred to as the Lateral) which runs from the canal to petitioners' property. This length of the Lateral runs through property other

than that owned by petitioners. The Lateral also receives "waste water" from land on higher ground which is served by another irrigation system. The Lateral was constructed sometime prior to 1900. At present it is maintained by those who wish to obtain water from it. Farmers Co-op. has no responsibility for the maintaining of the Lateral. Its 2-mile length from the Farmers Co-op. canal to the petitioners' property is mainly along a steep slope which has a tendency to slide and break the Lateral. It also is subject to frequent washouts and at the time petitioners acquired the property the Lateral was in a poor state of repair.

Ersel Beus managed the property for Beus Bros. and soon after the petitioners took possession of the property Ersel prepared the tillable portion for planting and planted the crop. During this time Arvel Child, who owned other property lying immediately north of petitioners', drilled an irrigation well near petitioners' northern boundary. After noticing this drilling, Ersel investigated the Lateral and discovered its poor condition. William and Ersel then decided to drill an irrigation well before repairing the Lateral. This well was completed about May 23, 1952, and furnished approximately 60-acre-inches of water. William and Ersel then decided to drill another well which was completed sometime in June 1952. This well furnished approximately 60-acre-inches of water. At this time the brothers decided to principally irrigate their property by means of wells rather than from the Lateral, and to this end a third well was completed in July. The amount of water which could be obtained from the 3 wells was approximately 180-acre-inches. In 1952, 1953, and 1954, the petitioners did obtain some irrigation water from the Lateral which was used as supplemental water on the 80-acre tract.

It is necessary to clean and weed all irrigation ditches in the spring in order that they will properly furnish water. In 1952 and 1953 Ersel cleaned out part of the Lateral. At the time of the hearing of this case the Lateral was still carrying some water.

Irrigation assessments levied by Farmers Co-op. with respect to the 185 shares of the capital stock of that company which were owned by petitioners were paid by the partnership of Beus Bros. on the following dates and in the following amounts:

| Date | Rate/Share | Amount |
|---|---|---|
| Nov. 20, 1952 | 1.25 | $231.25 |
| Mar. 13, 1953 | .55 | 101.75 |
| Nov. 7, 1953 | 1.25 | 231.25 |
| July 7, 1954 | .55 | 101.75 |

On January 29, 1953, Ersel and William filed with the Department of Reclamation of the State of Idaho an application for permit to appropriate the subterranean waters of that State by means of

wells, pumps, and ditches for irrigation and domestic purposes. On the application so filed the following written statement appears: "This filing is supplemental to existing water rights, however applicants intend to abandon existing water rights as soon as wells prove adequate."

In respect of the farmland mentioned above there was claimed as a deduction on the partnership return of income filed by Beus Bros. for the year 1952 the amount of $20,000 as an abandonment loss of a certain "irrigation sys.[tem]." This claimed deduction was reflected in the amounts of the distributive shares of the partnership net income as reported on such partnership return for that taxable year and in turn, in the net income of the partners, Ersel and William, as reported in their tax returns filed for that year. In his determination of deficiencies the respondent disallowed such claimed deduction. Petitioners did not abandon an irrigation system in 1952.

On September 2, 1952, certain persons, including one Arthur L. Pedersen, described therein as "Lessors," and certain other persons, including petitioner W. J. Beus, acting on behalf of the partnership of Beus Bros., and described therein as "Lessees," executed a written instrument described therein as "FARM LEASE—With Option to Buy" with respect to certain property and/or farmlands consisting of approximately 150 acres in Malheur County, Oregon. This instrument as originally executed provided as follows:

### FARM LEASE

#### With Option to Buy

\*     \*     \*     \*     \*     \*     \*

WITNESSETH;

That the lessors, in consideration of the performance by the lessees, of each and all of the terms, covenants and conditions hereinafter set forth as being incumbent upon them to be done and performed, including those for the payment of the cash rent herein agreed to be paid by the lessees unto the said lessors, do by these presents, rent, lease, demise and farm let unto the said lessees, the following described real property, with all water rights appurtenant thereto, situated and being in the County of Malheur, State of Oregon, to-wit:—

\*     \*     \*     \*     \*     \*     \*

To HAVE AND TO HOLD, The said real property and water rights, for a term of two years, commencing on the first day of December, 1952, and terminating on the first day of December, 1954, and then to be fully complete and ended.

At a cash rental for the said term of the sum of Fifteen Thousand ($15,-000.00) Dollars, payable at the times and in the manner following, to-wit:—

Cash, the sum of Six Thousand Five Hundred ($6,500.00) Dollars, the receipt whereof is hereby acknowledged by the lessors.

On or before, December 31, 1952, the sum of Eight Thousand Five Hundred ($8,500.00) Dollars, without interest if paid when due, but if not so paid when due the same shall draw interest, at the option of the lessors, at the rate of 5% per annum from December 31, 1952, until paid.

The said rental for the said term shall be paid by the lessees unto the lessors regardless as to whether the lessees exercise the option to buy the said property as hereinafter set forth.

The lessors agree to pay all taxes and all water assessments and other irrigation assessments on the said lands and water rights during the full term of this lease, Provided However, That if the lessees exercise the option herein granted to purchase the said property by January 2, 1953, then they agree to pay all taxes, water assessments and other irrigation assessments upon the said lands and for the said water rights for the year 1953 and all subsequent years.

\*   \*   \*   \*   \*   \*   \*

### OPTION TO BUY

In consideration of the sum of One ($1.00) Dollar to the lessors herein paid by the said lessees, the receipt whereof is hereby acknowledged, the said lessors hereby grant unto the said lessees, the option to purchase the above described real property and water rights at a total purchase price of $31,500.00, payable in current lawful money of the United States of America, at the times and in the manner following, to-wit:—

Cash, the sum of $5000.00, not later than January 2, 1953.

The remaining part of the said purchase price, if option be exercised, to be paid as follows:—

On or before, January 2, 1954, the sum of $5000.00.
On or before, January 2, 1955, the sum of $5000,00.
On or before, January 2, 1956, the sum of $5000.00.
On or before, January 2, 1957, the sum of $5000.00.
On or before, January 2, 1958, the sum of $5000.00.
On or before, January 2, 1959, the sum of $1500.00.

Each and all of the said deferred installments to draw interest at the rate of 5% per annum, and the interest shall be computed and paid annually on the 2nd day of January each year,—the first interest paying date being January 2, 1954. The interest payments shall be in addition to the principal installments herein agreed to be paid.

If this option be exercised by the lessees, it shall in nowise affect or reduce the aforementioned rent of $15,000.00 herein agreed to be paid by the said lessees.

\*   \*   \*   \*   \*   \*   \*

This OPTION expires on January 2, 1953, and unless the said lessees comply with each and all of the terms hereof by the said date, then thereafter the same shall no longer be in force and effect.

The property described had been listed for sale with several real estate dealers for approximately 1 year prior to the execution of the instrument set out above. It had been listed with all such dealers at a selling price of $47,500 and had never been listed for rental purposes. Subsequent to the execution of this instrument and sometime in September 1952, at the instance of William J. Beus, Arthur L. Pedersen agreed to an interlineation of the instrument which changed the sentence "Cash, the sum of $5000.00, not later than January 2, 1953" to read "Cash Loan of $5000.00, not later than January 2, 1953."

W. J. Beus paid $6,500 to the "Lessors" on September 2, 1952, and $1,000 was paid on November 1, 1952, such $1,000 being considered by the parties as an advance payment of a part of the $5,000 option payment which was payable not later than January 2, 1953. In addition to the payments set out above, the following amounts were paid on or about the dates shown below:

| | |
|---|---:|
| Dec. 29, 1952 | $8,500 |
| Jan. 2, 1953 | 4,000 |
| Between Jan. and Mar. 2, 1953 | 26,500 |

The "Lessees" took possession of the property on November 15, 1952, and reimbursed the "Lessors" in the amount of the pro rata portion of the Oregon property taxes after that date, which taxes were levied for the fiscal year ended June 30, 1953.

On February 19, 1953, Ersel and William submitted an application for a loan on the property for the purpose of refinancing the purchase contract and securing deed thereto. On the application for loan it was stated by the brothers that the property was purchased by them in 1952 at a purchase price of $46,500. The property was conveyed to the "Lessees" by warranty deed dated March 2 and 3, 1953.

The fair market value of the property during the period in issue was $46,500.

On the income tax return of W. J. Beus for 1952 the $6,500 payment referred to above was claimed as a deduction for rent. On the Beus Bros. partnership return of income for 1952 the $8,500 mentioned above was claimed as a deduction for rent. Such deduction is reflected in the net incomes of petitioners Ersel and William and reported in their respective income tax returns for 1952. In his determination of deficiencies the respondent disallowed such claimed deductions.

With respect to his individual or nonfarming operations during 1952, William claimed a deduction on his return for a loss in the amount of $5,090.27 which was computed as follows:

178 calves and heifers:

| | |
|---|---:|
| Sold | $12,000.00 |
| Cost | 17,090.27 |

—$5,090.27 loss

In his determination of the deficiency herein respondent did not allow any deduction for such claimed loss and petitioner does not question this adjustment. William did not make such purported sale of cattle in 1952. At least a part of the deficiency with respect to petitioners W. J. and Leone Beus is due to negligence or their intentional disregard of rules and regulations.

OPINION.

*Issue 1.*

The first issue for decision is whether in 1952 petitioners incurred a loss of $20,000 within the meaning of section 23 (e), I. R. C. 1939,[1] because of their abandonment of an irrigation system. Petitioners' argument in substance is that in 1952 they abandoned the Lateral, an appurtenance to the property, and that the water right represented by the Lateral was worth at least $20,000. The pertinent regulations provide as follows:

REGULATIONS 118.

Sec. 39.23 (e)–3 *Loss of useful value.* (a) When, through some change in business conditions, the usefulness in the business of some or all of the assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis * * * and the salvage value of the property. * * *

It has long been held that whether or not there has been an abandonment depends upon the intention of the owner coupled with the act of abandonment, both to be ascertained and determined from all the surrounding facts and circumstances. *Belridge Oil Co.*, 11 B. T. A. 127; *W. B. Davis & Son, Inc.*, 5 T. C. 1195; *Talache Mines* v. *United States*, 218 F. 2d 491. The mere intention to abandon is not sufficient. *Helvering* v. *Jones*, 120 F. 2d 828, certiorari denied 314 U. S. 661. Nor does nonuse alone constitute abandonment. *I. G. Zumwalt*, 25 B. T. A. 566; *W. B. Davis & Son, Inc., supra.*

Petitioners' contention cannot be sustained. From the evidence presented it is not clear to what extent the petitioners acquired an interest in the Lateral when they purchased the property from Child. However, it is not necessary to make such determination to reach a decision with respect to this issue since the petitioners have failed to sustain their burden of proving other necessary requisites of an allowable loss. Petitioners have failed to show that the usefulness of the Lateral suddenly terminated during the taxable year, as required by the regulations. Furthermore, the evidence is quite clear that petitioners did not discontinue use of the Lateral during the taxable year. Both Ersel and William testified that Beus Bros. used water from the Lateral during 1952, 1953, and 1954. In their application

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

(1) if incurred in trade or business; * * *

for permit to appropriate the subterranean waters of the State of Idaho, under date of January 23, 1953, Ersel and William stated that the application was supplemental to existing water rights which applicants *intended* to abandon as soon as wells proved adequate. Petitioners paid the Farmers Co-op. assessments levied in 1952, 1953, and 1954. Ersel cleaned out at least part of the Lateral in 1952 and 1953 to better obtain water therefrom. Under these facts we have found that petitioners did not abandon any irrigation system during the period in issue. Accordingly, respondent's determination with respect to this issue is sustained.

## *Issue 2.*

The second issue for decision is whether the amounts of $6,500 and $8,500 paid in 1952 by W. J. Beus and Beus Bros. partnership, respectively, under the terms of the "Farm Lease—With Option to Buy" were rental expenses of the petitioners within the meaning of section 23 (a) (1) (A), I. R. C. 1939.[2] The respondent disallowed claimed deduction for such payments and on brief contends that such payments were not paid as rentals but were payments on the purchase price of the property.

This Court on previous occasions has been required to determine whether payments under a lease-option agreement are payments of rent or purchase price. Regardless of the form of the transaction, we have treated "rental" payments as partial payments of the purchase price of the property involved, if by virtue of the payments the taxpayer has acquired or will acquire title to, or an equity in, the property. *Chicago Stoker Corporation*, 14 T. C. 441; *Judson Mills*, 11 T. C. 25.

In *D. M. Haggard*, 24 T. C. 1124, affd. 241 F. 2d 288, we said, at page 1129:

To properly discern the true character of the payment, * * * it is necessary to ascertain the intention of the parties as evidenced by the written agreements, read in the light of the attending facts and circumstances existing at the time the agreement was executed.

In the instant case the record shows that the property had been listed for sale for approximately 1 year at a selling price of $47,500 and that the owners had not considered leasing or renting it. The real estate agent who handled the transaction testified that the only way the petitioners would consider the property was under a lease-option agree-

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) Expenses.—

(1) Trade or business expenses.—

(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * *

ment. Pedersen, the principal owner of the property at the time of the execution of the lease-option agreement, testified that at all times he considered that the property was being sold and that the Beuses wanted the lease-option agreement for tax purposes. Petitioners have offered no evidence tending to show that their insistence upon having a lease-option agreement was prompted by considerations other than those of tax. Petitioners' consciousness of the tax aspects of the agreement is further demonstrated by the fact that William insisted that the agreement be altered after its execution, such alteration being intended to strengthen petitioners' position taxwise. On application for a loan on the property in 1953 the petitioners stated that the property was acquired by them in 1952 for $46,500. The petitioners introduced some testimony that $15,000 was a reasonable rental for 2 years' use of the property. However, they do not dispute that the fair market value of the property at this time was approximately $46,500, although the "option price" under the lease-option agreement was $31,500. It also must be noted that the aggregate of the "rentals" and "option price" under the agreement amounted to $46,500. Under these facts we hold that at the time of the execution of the agreement in issue the parties intended a sale of the property and that by virtue of the payments in issue petitioners intended to and were acquiring an equity therein. Accordingly, we sustain respondent's determination that such payments did not constitute rental within the meaning of section 23 (a) (1) (A).

## Issue 3.

The last issue for decision is whether respondent properly determined an addition to tax under section 293 (a), I. R. C. 1939,[3] with respect to petitioners W. J. and Leone Beus. Petitioners Ersel H. and Anna M. Beus are not involved. As a basis for such determination respondent has primarily relied upon petitioners' claim on their return for the year 1952 of a loss in the amount of $5,090.27 on account of a sale by William during that year of certain cattle or other livestock. Petitioners do not question respondent's disallowance of a deduction for such claimed loss and they have offered no evidence in explanation of such items. Respondent's agent testified that examination of checks issued by William and by the partnership indicate William made purchases of cattle during 1952 in the amount of $18,040.99. Whether for his own account or for the partnership

---

[3] SEC. 293.  ADDITIONS TO THE TAX IN CASE OF DEFICIENCY.

(a) NEGLIGENCE.—If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 272 (i) relating to the prorating of a deficiency, and of section 292, relating to interest on deficiencies, shall not be applicable.

is not clear. On November 4, 1952, William issued 2 checks on his personal account, 1 in the amount of $2,727.70 for the purchase of 31 calves and 1 in the amount of $7,592.76 for the purchase of 66 steers. On November 3, 1952, one day prior thereto, the partnership issued its check to William in the amount of $10,000 which was deposited in William's personal bank account. A few days later the partnership issued to William another check in the amount of $2,000 which was also deposited in William's personal bank account. Respondent's agent also testified he found no record among petitioners' accounts of any actual sale of cattle by William during the year 1952.

William's testimony that his return was prepared by an accountant, if intended as such, does not constitute a sufficient excuse for having claimed the purported loss as a deduction, in the absence of evidence as to the qualifications of the accountant and the information furnished him on the basis of which the return was prepared. Explanations made on brief (which are here also lacking in clarity) without support in the record may not be considered.

Petitioners' failure to contest the adjustment made by respondent, together with their failure to explain the items or to offer any reasonable excuse for claiming the loss deduction, warrants sustaining respondent's determination with respect to this issue. *Rhett W. Woody*, 19 T. C. 350. Accordingly, respondent's determination of additions to tax under section 293 (a) with respect to petitioners W. J. and Leone Beus is sustained.

Since it was stipulated that there are no additions to tax due from either of the petitioners for the year 1952 under the provisions of section 294 (d) (1) (A) of the Internal Revenue Code of 1939, no determination of that question is necessary.

*Decisions will be entered under Rule 50.*